

# Fourth Court of Appeals
## San Antonio, Texas

## MEMORANDUM OPINION

No. 04-12-00660-CV

Jaime E. **VALENZUELA**,
Appellant

v.

Gabriela **MUNOZ**,
Appellee

From the 57th Judicial District Court, Bexar County, Texas
Trial Court No. 2012-CI-12410
Honorable Larry Noll, Judge Presiding

Opinion by:    Luz Elena D. Chapa, Justice

Sitting:       Catherine Stone, Chief Justice
               Marialyn Barnard, Justice
               Luz Elena D. Chapa, Justice

Delivered and Filed:  August 28, 2013

AFFIRMED

Jamie Valenzuela appeals the trial court's protective order that restrains him from contacting his former girlfriend, Gabriela Munoz, except for the limited purpose of coordinating visitation with their son. He argues the evidence was legally and factually insufficient to support the required findings that (1) family violence had occurred and (2) family violence was likely to occur in the future. We affirm the order.

**BACKGROUND**

Valenzuela and Munoz were in a sexual relationship from October 2010 to July 2012, although Valenzuela was married to a different woman. Munoz testified that they initially had a good relationship, but Valenzuela became jealous and emotionally abusive around the time she became pregnant with their son and gave birth to him.

*The July Incident*

Valenzuela does not live in San Antonio, but was in town for a conference when the alleged violence occurred in July 2012. On the first night of the conference, Valenzuela and Munoz had sex and argued afterward about the future of their relationship. They continued to communicate through text messages over the next two days, until the main incident precipitating the protective order occurred at Munoz's house.

Valenzuela and Munoz offered competing testimony about the events of that night. Initially, they disagree about why Valenzuela went to Munoz's house. According to Munoz, Valenzuela called her that night, told her that he was in trouble, and asked her to come pick up his gun because he was drunk. She refused, and despite her protests, Valenzuela insisted that he go to her house and did so, appearing drunk, angry, and frustrated. By contrast, Valenzuela testified that, while he was playing cards with his coworkers at his hotel, Munoz was barraging him with text messages, asking him to come over to her house. He was reluctant because he was considering ending their relationship. Although he told Munoz that he was drunk, he testified he stopped drinking three hours before texting Munoz and he was not drunk when he arrived at her house.

Munoz testified that once Valenzuela was inside the house, he loaded his gun, began to "sweep" the house, and said he would shoot anyone found. Valenzuela testified that he *un*loaded his gun when he entered her house, but admitted he did "clear" her house with his gun drawn, going from room to room "like a SWAT team." According to Munoz, Valenzuela repeatedly said

he had come over to take away his son. She claimed that Valenzuela picked up their son and tried to leave several times. Valenzuela denied that he intended to leave with the child and claimed he returned him to Munoz whenever she asked. Munoz also claimed Valenzuela made threats to kill her and her family so that only the Valenzuela family would raise their son—threats which Valenzuela adamantly denied.

Their argument spilled into the street. There was testimony from both Valenzuela and Munoz that they continued to exchange—voluntarily or not—their son between them. There was testimony that Munoz repeatedly tried to hide Valenzuela's gun and keys. There was also testimony that Valenzuela took Munoz's car keys away from her. Eventually, Valenzuela drove away without their son or his gun.

Munoz's brother testified he had seen Munoz and Valenzuela arguing outside, and after Valenzuela left, he drove up to her house. According to Munoz, her brother was carrying the child outside when Valenzuela returned and took the child from her brother's arms. When Munoz attempted to remove their son from Valenzuela's arms, Munoz and her brother testified that Valenzuela grabbed Munoz's hair and jerked her back and forth. Her brother intervened, and Valenzuela swung at him, saying he would break his neck and kill him. When Valenzuela finally left, he said he was "going to come back with a bigger gun and I'm going to kill you." Valenzuela denied that he made any threats, swung at her brother, or pulled Munoz by her hair. Valenzuela was arrested that night and charged with making terroristic threats.

*The Truck Incident*

Munoz also testified about a violent incident involving Valenzuela that occurred some months before the July incident. Valenzuela had taken Munoz's cellular phone away from her, and when she tried to retrieve it from his truck with him behind the wheel, Valenzuela put the truck in motion and dragged her several feet. Munoz's mother testified that she witnessed the incident and

agreed with Munoz's portrayal. Yet according to Valenzuela, he told Munoz to wait because he was going to park the truck, but she decided to reach for the phone while the truck was in motion.

*Other Testimony*

Munoz's former supervisor in the National Guard testified that while Munoz was pregnant, she confided in him that she was afraid of Valenzuela because violence existed in their relationship.

Valenzuela's own supervisor from the National Guard testified that Munoz repeatedly texted Valenzuela on the night of the July incident, but he was reluctant to go over to her house because he wanted to end their relationship.

Valenzuela's estranged wife and his two older sons testified Valenzuela was not a violent person and had not committed family violence against them.

## APPLICABLE LAW

*Protective Orders*

After conducting a hearing on an application for a protective order, the court may render a protective order if it finds that (1) family violence has occurred and (2) family violence is likely to occur in the future. TEX. FAM. CODE ANN. § 85.001(a), (b)(1) (West 2008 & Supp. 2012). Family violence, as relevant to this appeal, is an act (1) against a person with whom the actor has or has had a dating relationship and (2) intended to result in physical harm, bodily injury, or assault or to threaten the same. *Id.* §§ 71.004(3); 71.0021(a).

*Standard of Review*

Valenzuela did not have the burden of proof at the hearing; therefore, we will reverse the trial court's protective order on legal sufficiency grounds if the evidence supporting the order could not "enable reasonable and fair-minded people to reach the verdict under review." *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005). A finding is not reasonable if "(1) the record discloses a complete absence of evidence of a vital fact, (2) the court is barred by rules of law or of evidence

from giving weight to the only evidence offered to prove a vital fact, (3) the evidence offered to prove a vital fact is no more than a mere scintilla, or (4) the evidence establishes conclusively the opposite of a vital fact." *Id.* at 809. We must "credit favorable evidence if reasonable jurors could, and disregard contrary evidence unless reasonable jurors could not." *Id.* at 827.

We may overturn the protective order on factual sufficiency grounds only if, after considering and weighing all the evidence, the findings supporting the order are "so contrary to the overwhelming weight of the evidence that they are clearly wrong and unjust." *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986) (per curiam).

Of course, the trial court is the sole judge of witnesses' credibility and the weight accorded to their testimony. *See City of Keller*, 168 S.W.3d at 819. It may choose to believe one witness and disbelieve another, either in whole or in part. *See id.*; *Peña v. Garza*, 61 S.W.3d 529, 532 (Tex. App.—San Antonio 2001, no pet.).

APPLICATION

*Past Family Violence*

The record discloses evidence of at least two discrete events supporting the finding that Valenzuela committed family violence against Munoz.[1] Munoz and her brother both testified that Valenzuela grabbed Munoz's hair and jerked her back and forth during the July incident. Munoz and her mother also testified to another incident where Valenzuela deliberately put his truck into reverse and dragged her several feet while Munoz was reaching inside of it. Although Valenzuela claims "[t]here was a complete absence of evidence as to real attempts by [Valenzuela] to do anything harmful to [Munoz] or the child," his brief is devoid of any mention of how he grabbed

---

[1] We rely on two discrete instances of Valenzuela's actual physical contact against Munoz. However, we do not imply that Valenzuela's other alleged actions that night, such as his "SWAT-style" sweep of her home or attempt to take their son while intoxicated, would not also support a finding of family violence.

Munoz's hair and shook her. He does, however, attempt to characterize the truck-dragging incident as a "he-said, she-said" situation, referring to his testimony that Munoz reached into his truck while it was moving. But his characterization overlooks the standard of review, which requires us to view the evidence in the light most favorable to the verdict, and the trial court's prerogative to believe or disbelieve witnesses. *See City of Keller*, 168 S.W.3d at 827; *Peña*, 61 S.W.3d at 532. The trial court also could have believed Munoz's supervisor, when he testified that Munoz was afraid of the violence in her relationship with Valenzuela. In sum, Munoz's supervisor's testimony and the evidence regarding these two physical acts is "more than a scintilla of evidence" that family violence occurred and is therefore legally sufficient. *See City of Keller*, 168 S.W.3d at 809.

With respect to the factual sufficiency of the evidence, we have examined the parties' diametrically opposed accounts of that night. According to Munoz, a drunk Valenzuela arrived uninvited at her home, brandished a loaded handgun, attempted to take their son away, and attacked both her and her brother. On the other hand, Valenzuela testified that he was not drunk, he unloaded the gun as soon as he arrived, he did not attempt to leave with their son, and he never attempted to attack Munoz or her brother. The trial court was free to disbelieve Valenzuela's portrayals of these events in their entirety. *See Peña*, 61 S.W.3d at 532. Aside from making general claims that Munoz's version of the events was "unbelievable" and designed to gain an advantage in a custody case, Valenzuela does not offer, and we cannot discern, any principled basis for reversing the trial court's implicit credibility determinations. Accordingly, the finding that Valenzuela committed family violence is factually sufficient because it is not "so contrary to the overwhelming weight of the evidence that [it is] clearly wrong and unjust." *See Cain*, 709 S.W.2d at 176.

*Likelihood of Future Family Violence*

To establish the likelihood that Valenzuela will commit family violence in the future, Munoz may rely on instances of past family violence. Texas courts have stated that "[o]ftentimes,

past is prologue; therefore, past violent conduct can be competent evidence which is legally and factually sufficient to sustain the award of a protective order." *In re Epperson*, 213 S.W.3d 541, 544 (Tex. App.—Texarkana 2007, no pet.); *see also Flanigan v. Glasgow*, No. 04-11-00516-CV, 2012 WL 3104419, at *2 (Tex. App.—San Antonio Aug. 1, 2012, pet. denied) (mem. op.); *Teel v. Shifflett*, 309 S.W.3d 597, 604 (Tex. App.—Houston [14th Dist.] 2010, pet. denied); *Clements v. Haskovec*, 251 S.W.3d 79, 87 (Tex. App.—Corpus Christi 2008, no pet.).

As discussed above, the evidence discloses at least two discrete instances of physical family violence. Munoz also said Valenzuela had gradually grown more abusive after she became pregnant with their son. *See Clements*, 251 S.W.3d at 87 (applicant testified the respondent had become increasingly violent in the eight months before she sought a protective order). And she testified Valenzuela made several threats to kill her, her family, and himself. We hold the evidence of violence existing in their relationship according to Munoz's supervisor, two past incidents of family violence, and the threats of further violence are more than a scintilla of evidence that there was a likelihood Valenzuela would commit future acts of family violence. *See id.* (holding respondent's increasingly violent behavior and past instances of family violence justified trial court's finding that family violence would likely reoccur).

Against the evidence that he committed acts of family violence and threatened to commit more, Valenzuela points to testimony by his estranged wife and two adult sons that he has never committed family violence against them and that in the two months between the July incident and the issuance of the order, there were no incidents of family violence. Again, we must recognize that the trial court, as the factfinder, had the prerogative to believe or disbelieve the witnesses at the hearing. *Peña*, 61 S.W.3d at 532. We also note the trial court was not obligated to ignore previous incidents of family violence simply because no further assaultive behavior occurred in the lead up to the protective order hearing. *See Clements*, 251 S.W.3d at 87–88. We are therefore

unpersuaded that the trial court erred when it found the likelihood of family violence existed, and we hold the evidence to be factually sufficient.

## CONCLUSION

We affirm the protective order.

Luz Elena D. Chapa, Justice